UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re: Harpole Construction, Inc., New Mexico Domestic Profit
EIN: 47-0886258,

Debtor.                                                    No. 15-12630-t11

**DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT, DATED JULY 29, 2016**

*Table of Contents*

I. Introduction
II. Background
III. Summary of the Plan of Reorganization and
    Treatment of Claims and Equity Interests
IV. Confirmation Requirements and Procedures
V. Effect of Confirmation of a Plan
VI. Other Plan Provisions

| | |
|---|---|
| Exhibit A | Plan |
| Exhibit B | Identity and Value of Material Assets of Debtor |
| Exhibit C | Pre-Petition Financial Statements |
| Exhibit D | Schedule of Receipts and Disbursements |
| Exhibit E | Liquidation Analysis |
| Exhibit F | Cash on Hand/Sources of Funds |
| Exhibit G | Projections |
| Exhibit H | Form of Ballot |
| Exhibit I | Creditor List |
| Exhibit J | Estimated Payment Schedule |
| Exhibit K | Insider Transactions |
| Exhibit L | Commercial Lease for Farmington Location |
| Exhibit M | Commercial Lease for Hobbs Location |
| Exhibit N | Commercial Lease for Midland Location |
| Exhibit O | Estimate of Market Rent Appraisal Report for Farmington Location |
| Exhibit P | Estimate of Market Rent Appraisal Report for Hobbs Location |
| Exhibit Q | Appraisal Report for TX Property |
| Exhibit R | Executive Summary |
| Exhibit S | Contract Listing |

1

## I.  INTRODUCTION

This is the Second Amended Disclosure Statement (the "Disclosure Statement") in the chapter 11 case of Harpole Construction, Inc. (the "Debtor"). The Debtor is not filed as a small business.  This Disclosure Statement contains information about the Debtor and describes the Debtor's Second Amended Plan of Reorganization, Dated July 29, 2016 (the "Plan") filed by the Debtor on July 29, 2016.

A full copy of the Plan is attached to this Disclosure Statement as Exhibit A. *Your rights may be affected. You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one.*

The Plan has 8 classes of classified claims.  Classes 1 through 5 are allowed secured claims. Class 6 is the non-insider unsecured class.  Class 7 is the insider claims class.  Class 8 is the equity interest holder class.

Holders of allowed secured claims in Classes 1 through 5 will be paid on the secured portion of their claim, any unsecured portion of these claims are treated in Class 6.

The proposed distributions under the Plan are discussed in Section III of this Disclosure Statement. General unsecured creditors are classified in Class 6.  Holders of allowed Class 6 Claims will be paid monthly Plan Payments of $30,000.00 plus 50% Net Recoveries from possible Chapter 5 claims received post Effective Date.   Distribution to Class 6 creditors will be made *pro rata*, based on the ratio of the allowed claim of each Class 6 creditor to the aggregate amount of all allowed Class 6 Claims.  The Debtor anticipates that this will pay 51% of the Class 6 Claims.  If the estimate of the unsecured class is approximately correct and the Debtor makes the Plan Payments as scheduled the estimate should be accurate.  If the unsecured class becomes larger, then the liquidation percentage and the Chapter 11 Distribution would both decrease.  The distribution percentage may increase based on recoveries from post-Effective Date Chapter 5 claims.

The proposed distributions to unsecured creditors under the Plan would be approximately 51%.  The Debtor would ask that all creditors support confirmation of the Plan.

### A. Purpose of This Document

This Disclosure Statement describes:

- The Debtor and significant events during the bankruptcy case,

- How the Plan proposes to treat claims or equity interests of the type you hold (*i.e.*, what you will receive on your claim or equity interest if the plan is confirmed),

- Who can vote on or object to the Plan,

- What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plan,

2

- Why the Debtor believes the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation, and

- The effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement. This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights. If there is a conflict between the Disclosure Statement and the Plan, the Plan controls.

## B. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing

The Court has not yet confirmed the Plan described in this Disclosure Statement. This section describes the procedures pursuant to which the Plan will or will not be confirmed.

1. *Time and Place of the Hearing to Finally Approve This Disclosure Statement and Confirm the Plan*

Pursuant to 11 U.S.C. §1125(b), after notice and a hearing, the Court must determine whether this Disclosure Statement contains information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor, typical of the classes of creditors and other parties in interest being solicited, to make an informed judgment regarding the Plan. If the Court so rules, an order will be entered to that effect.

**Hearing on Plan Confirmation**. The Court will hold a hearing to determine whether the Plan should be confirmed. The hearing will take place before the Honorable David T. Thuma, United States Bankruptcy Judge, Dennis Chavez Building and U.S. Courthouse, 500 Gold Avenue SW, 13th Floor, Albuquerque, New Mexico or as designated by the Court. Notice of a hearing place and date will be mailed to all Holders of Claims or Interests, and other interested parties listed on the mailing matrix. You may attend the hearing. Parties who timely file a written objection to the Plan with the Clerk of the Bankruptcy Court may present to the Court arguments in opposition to confirmation of the Plan.

2. *Deadline For Voting to Accept or Reject the Plan*

If you are entitled to vote to accept or reject the plan, you will receive a ballot on which to vote, substantially in the form attached as **Exhibit H** (the "Ballot"). The Ballot Date will be indicated on the Ballot. The original executed Ballot should be returned to Debtor's counsel as follows:

William F. Davis & Associates, P.C.
6709 Academy NE, Suite A
Albuquerque, NM 87109
Attn: William F. Davis, Esq.
Fax: (505) 243-6129
Email: *daviswf@nmbankruptcy.com*

3

See section IV.A. below for a discussion of voting eligibility requirements.

*If you wish your Ballot to be counted, you must mail, deliver, email, or fax your Ballot so that it is received by Debtor's counsel by 5:00 p.m. Mountain Standard Time on the Ballot Date shown on the Ballot. A vote received after 5:00 p.m. Mountain Standard Time on the Ballot Date will not be counted.*

      3. *Deadline For Objecting to the Adequacy of Disclosure and Confirmation of the Plan*

Objections to this Disclosure Statement or to the confirmation of the Plan must be filed with the Court and served upon Debtor's counsel by the date set by the Court in the Order.

      4. *Identity of Person to Contact for More Information*

If you want additional information about the Plan, you should contact William F. Davis & Assoc., P.C. at the address shown above, or by telephone at (505) 243-6129.

C.    **Disclaimer**

Section 1125 of the Code requires the Court to approve the information contained in this Disclosure Statement. Such approval, however, does not constitute a judgment by the Court as to the desirability of the Plan, or as to the value or suitability of any consideration offered thereby.

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF STATEMENTS CONTAINED THEREIN.**

**D. No Representations Other than Contained Herein.** No representations concerning the Debtor or the Plan are authorized by the Debtor other than as set forth in this Disclosure Statement. Any representations or inducements made by any person to secure votes for or against the Plan which are other than as contained herein should not be relied upon, and such representations should be reported to Debtor's counsel.

II.    **BACKGROUND**
    **A. Description and History of the Debtor's Business**

The Debtor is a New Mexico corporation that engages in pipeline maintenance, repair, and installation. The Debtor performs pipeline maintenance, repair, and installation on pipelines and property owned by other companies such as Western Refining. The Debtor itself does not own any real property or hold any interest in any oil and gas properties or oil and gas leases.

The corporation was formed on September 3, 2002. Debtor has offices in Farmington, New Mexico, Hobbs, New Mexico, and Midland, Texas. There are currently no environmental

4

concerns associated with the Debtor and its operations. The Debtor's responsible party and President is Jerry Harpole, Sr.

In addition to the President, Jerry Harpole, Sr., the Debtor's management and equity security holders consist of the following: Deborah Harpole, Secretary/Treasurer; Jerry E. Harpole, Jr., shareholder; and John E. Harpole, shareholder.

The Debtor has approximately 165 employees. Debtor's payroll averages between approximately $133,000 to $500,000 per month depending on the projects and amount of work in a given month.

The Debtor's assets consist of machinery and equipment, heavy trucks, light trucks, tractors, trailers, automobiles, and leasehold improvements. Combined, Debtor's assets hold an estimated net value of approximately $2,700,000.00. The Debtor believes the liquidation value of the Debtor's assets in a Chapter 7 proceeding would be approximately $1,600,000.00.

## B.    Insiders of the Debtor

The Debtor's President and 40% shareholder is Jerry Harpole, Sr. The Debtor's secretary and treasurer is Deborah Harpole. Deborah Harpole is also a 40% shareholder of the Debtor. Jerry Harpole, Jr. is a 10% shareholder of the Debtor. John Harpole is a 10% shareholder of the Debtor.

## C.    Management of the Debtor Before and During the Bankruptcy

Jerry Harpole, Sr. was the Debtor's President prior to bankruptcy, post-petition, and the Debtor anticipates Jerry Harpole, Sr. will remain the President post-confirmation. Deborah Harpole was the Debtor's secretary and treasurer prior to the bankruptcy, post-petition, and the Debtor anticipates Deborah Harpole will remain secretary and treasurer post-confirmation. Jerry Harpole, Jr. and John Harpole are also employed by the Debtor and participate in management and the Debtor anticipates this to continue post-confirmation.

After the effective date of the order confirming the Plan, the directors, officers, and voting trustee of the Reorganized-Debtor, (collectively the "Post Confirmation Management"), will be the same. The responsibilities and compensation of Post Confirmation Management are described in section III(D)(2) of this Disclosure Statement.

## D.    Events Leading to Chapter 11 Filing

The Debtor performed services owned, leased or otherwise in the possession of Western Refining. The Debtor's work was done in connection with an Agreement for Services dated October 26, 2012 between the Debtor and Western Refining Southwest, Inc. as amended by an Amendment to Agreement for Services dated October 30, 2015 and an Agreement for Services dated October 26, 2012 between Western Refining Pipeline Company and the Debtor as extended by an Agreement to Extend Agreement for Services dated March 12, 2015 between Western Refining Pipeline, LLC, Western Refining Terminals, LLC and the Debtor.

5

Western Refining refused to release all funds owed to the Debtor in connection with these projects. This lack of cash flow created a cash on hand shortage that created financial difficulty in paying the Debtor's subcontractors and resulted in this bankruptcy case being filed.

E.    **Significant Events During the Bankruptcy Case**

<u>Employment of Professionals</u>. The Court has approved the employment of William F. Davis & Assoc., P.C. as its bankruptcy counsel,

<u>Bar Date</u>. The Bar Date set by the Court for filing pre-petition claims was February 1, 2016,

<u>Monthly Operating Reports</u>. The Debtor is current in the filing of its Monthly Operating Reports, See MOR Summary, Exhibit D,

<u>Unsecured Creditors' Committee</u>. An Unsecured Creditors' Committee by appointed by the US Trustee in this case on October 29, 2015.

<u>Industrial Maintenance Contractors, Inc. Settlement.</u> The Debtor filed a Motion for Approval of Settlement with Creditor Industrial Maintenance Contractors, Inc. on May 19, 2016. The Debtor and Industrial Maintenance Contractors, Inc. reached an agreement to release all claims against each other in exchange for Industrial Maintenance Contractors, Inc. waiving its unsecured claim of $111,849.00 and payment of $47,735.31 to the Debtor upon approval of the Motion for Approval of Settlement. An Order approving the settlement has been entered and the payment of $47,735.31 was received by the Debtor.

<u>Roper, Inc.  Settlement.</u> The Debtor filed a Motion for Approval of Settlement with Roper, Inc. ("Roper"). The Debtor and Roper reached an agreement to release all claims against each other in exchange for Roper granting the Debtor an enforceable judgment of $55,000.00 to be paid in 3 payments. The first payment of $18,333.34 is to be made on the date that is 30 days after the entry of an Order on the Settlement. The Second payment of $18,333.33 shall be due within 60 days of the Order entered on the Settlement. The third and final payment of $18,333.33 shall be due within 90 days of the Order entered on the Settlement. No interest shall accrue or be charged on the judgment of $55,000.00. The Debtor shall not seek to enforce the judgment as long as payments are made as set out in this paragraph. If the payments are not made as set forth in this paragraph the Debtor may seek enforcement of the judgment. The judgment outlined above shall be held by Debtor's attorney and will not be enforced unless there is a default. Upon the entry of an Order approving the Settlement, Roper shall no longer be an interested party in this Bankruptcy Case and will no longer have the authority to vote on any plan of reorganization or to participate any further in this Bankruptcy Case. Roper shall withdraw any pending objection to the Amended Plan and Disclosure Statement and shall not be permitted to file any objection to the Amended Plan and Disclosure Statement or any subsequent Plan or Disclosure Statement filed in this case. Roper shall not be permitted to vote on the Amended Plan or any subsequent filed Plan in this case. Roper's proof of claim and amended proof of claim are disallowed in their entirety. Roper shall not have a claim of any kind in this case. Roper shall withdraw from the Committee of Unsecured Creditors and as an interested party in this case. Upon entry of an Order on this Settlement the Debtor shall withdraw its Emergency Motion. Upon entry of an Order on this Settlement the Debtor shall withdraw its Motion to Designate.

6

Upon completion of the 3 payments totaling $55,000.00 by Roper, the Debtor shall file an order in Adversary Case 16-01036 dismissing the complaint with prejudice.

The Deadline to object to the Roper settlement was July 25, 2016. No objections to the settlement were filed. An order approving this settlement was entered on July 28, 2016. (Docket No. 272).

Harpole Development, Inc. ("HDI") Settlement. The Debtor filed a motion to Approve Settlement with Harpole Development, Inc. and Jerry and Deborah Harpole on July 14, 2016. (Docket No. 261). An Order was entered shortening the objection period on this Motion. (Docket No. 263). The Debtor, HDI, and Jerry and Debbie Harpole reached an agreement that Jerry and Debbie Harpole, as individuals, agree to cause HDI to transfer the TX Property (as defined in the Motion) by warranty deed to the Debtor. Upon an order entered on this Motion the Debtor and HDI shall execute all documents necessary to facilitate the transfer of the TX Property from HDI to the Debtor. In exchange for the transfer the Debtor, Debtor's Estate, and Reorganized Debtor agree to release any and all possible claims regarding the TX Property, including but not limited to any claims for taxes, insurance, utility payments, maintenance, or any other expenses paid for the benefit of the TX Property, against Jerry Harpole, Debbie Harpole, Jerry Harpole, Jr., John Harpole, Jennifer Harpole, John C. Harpole, Jerry Harpole, III, James T. Harpole, Wesley Hunter, and HDI ("Insiders"). In exchange for the transfer Jerry Harpole, Debbie Harpole, Jerry Harpole, Jr., John Harpole, Jennifer Harpole, John C. Harpole, Jerry Harpole, III, James T. Harpole, Wesley Hunter, and HDI agree to release all possible claims against the Debtor, the Debtor's Estate, and the Reorganized Debtor for any and all claims related to the TX Property. This includes the release of the claim of $6,000.00 by HDI listed in the Debtor's bankruptcy.

The Deadline to object to the HDI settlement is August 1, 2016. As of the filing of this Disclosure Statement no objections have been filed.

Open Adversary Cases. The Debtor filed Adversary case 16-01036 against Roper, Inc. on June 1, 2016. The Debtor filed Adversary case 16-01037 against T.G. Mercer on June 3, 2016. The Debtor believes that T.G. Mercer was paid $93,000.00 that qualifies as a preferential transfer and should be recovered to the Estate.

Selected Filings. The filings in this case include:

| | | |
|---|---|---|
| 10/2/15 | Petition | Doc. 1 |
| 10/26/15 | Stipulated Interim Order Granting Use of Cash Collateral for the Interim Period of October 13, 2015 Through October 31, 2015 | Doc. 30 |
| 10/29/15 | Appointment of Unsecured Creditors' Committee | Doc. 36 |
| 11/6/15 | Stipulated Order on Debtor's Motion for Use of Cash Collateral for the Interim Period of November 1, 2015 Through December 31, 2015. | Doc. 49 |
| 11/13/15 | Order Employing William F. Davis & Assoc., P.C. | Doc. 59 |
| 12/4/15 | Order Granting Motion to Employ Counsel for Unsecured Creditors' Committee | Doc. 87 |
| 12/11/15 | Order on Debtor's Request to Use Cash Collateral For the Interim Period December 1, 2015 Through | Doc. 98 |

| | | |
|---|---|---|
| | January 31, 2016 | |
| 12/15/15 | Order Pursuant to 11 U.S.C. Section 364(c)(2) Authorizing Debtor to Enter into Insurance Premium Finance Agreement with First Insurance Funding | Doc. 104 |
| 12/16/15 | Order Fixing Time for Filing Proofs of Claim and Interests | Doc. 106 |
| 12/23/15 | Amended Order Pursuant to 11 U.S.C. 364(c)(2) Authorizing Debtor to Enter into Insurance Premium Finance Agreement with First Insurance Funding | Doc. 112 |
| 1/5/16 | Agreed Order for Adequate Protection with Wells Fargo Equipment Finance | Doc. 117 |
| 1/5/16 | Order Granting Debtor's Application to Employ Bruce F. Malott CPA as Accountant for Debtor | Doc. 118 |
| 1/11/16 | Agreed Order for Relief from Stay and Abandonment Of Property with Caterpillar Financial Services Corp. | Doc. 121 |
| 1/13/16 | Order Granting Four Corners Community Bank's Motion for Approval of Adequate Protection Agreement Between the Debtor and Four Corners Community Bank with Respect to Trenchers | Doc. 123 |
| 1/25/16 | Agreed Order Regarding Western Refining's Amended Motion for Relief from Automatic Stay Against Property of the Estate Pursuant to 11 U.S.C. Section 362(d) | Doc. 132 |
| 1/28/16 | Order Resulting from Hearing on Cash Collateral | Doc. 140 |
| 2/2/16 | Stipulated Order Continuing Debtor's Use of Cash Collateral for the Interim Period of February 1, 2016 Through February 29, 2016 | Doc. 142 |
| 2/12/16 | Agreed Order for Relief from Stay and Abandonment With John Deere Construction and Forestry Co. | Doc. 151 |
| 2/17/16 | Agreed Order for Adequate Protection with With John Deere Construction and Forestry Co. | Doc. 155 |
| 2/29/16 | Order on Debtor's Motion for Use of Cash Collateral For the Interim Period of March 1, 2016 Through April 30, 2016 | Doc. 161 |
| 3/18/16 | Stipulated Order Granting Relief From Stay With Enterprise Fleet Management, Inc. | Doc. 166 |
| 3/22/16 | Stipulated Order Authorizing Rule 2004 Exam | Doc. 168 |
| 5/5/16 | Objection to Proof of Claim 45 (Roper) filed by Debtor | Doc. 201 |
| 6/3/16 | Adversary case 16-01037 Recovery of money/ property - 547 preference against T.G. Mercer Consulting Services, Inc. filed by the Debtor | Doc.233 |
| 6/3/16 | Agreed Order for Relief from Stay and Abandonment of Property and for Adequate Protection between Debtor and Ally Financial | Doc. 234 |
| 6/22/16 | First Application for Compensation for William F. Davis, Debtor's Attorney | Doc. 247 |
| 7/14/16 | Motion to Approve Settlement with Harpole Development, Inc. and Jerry and Deborah Harpole | Doc. 261 |

8

## F. Projected Recovery of Avoidable Transfers

The Debtor is in the process of researching and analyzing its pre-petition transfers. If it identifies any additional possible sources of recovery or avoidable transfers under 11 U.S.C. §547 and/or §548 or any actions under 11 U.S.C. §547 and/or §548, it will disclose them.

Below is an analysis of pre-petition transfers the Debtor has investigated, or recovered. The Debtor continues to investigate possible pre-petition transfers and will update creditors should additional viable claim recoveries exist.

The Reorganized Debtor, counsel for the Reorganized Debtor, or special counsel for the Reorganized Debtor will be charged with bringing any actions for Chapter 5 claims. In addition, counsel for the UCC is given the right to bring fraudulent transfer claims against insiders. Any UCC action on fraudulent transfer claims against insiders must be filed by the Effective Date. Any resolution of Chapter 5 claims against insiders brought by UCC counsel is subject to Court approval after notice to the Debtor, Reorganized Debtor, US Trustee, UCC counsel, and Four Corners Community Bank.

Should any funds be recovered, the Debtor will contribute 50% of the Net Recovery[1] from any Chapter 5 post Effective Date recovery to Class 6 in addition to the monthly Plan Payment. The other 50% from post Effective Date Net Recovery will belong to the Reorganized Debtor to use for operating expenses.

The Debtor will continue to investigate any possible Chapter 5 claims and have collected documents, and shared all those collected documents with the UCC. At this time, the Debtor has not identified any Chapter 5 claims against insiders other than against Harpole Development, LLC ("HDI") as described below.

Below is a chart summarizing what claims the Debtor believes exist at this time.

| Name | Chapter 5 Action Exist | Possible Recovery Amount |
|---|---|---|
| Jerry Harpole, Sr. | Not at this time | |
| Deborah Harpole | Not at this time | |
| Jerry (JJ) Harpole, Jr. | Not at this time | |
| John (Jake) Harpole | Not at this time | |
| Jennifer Harpole | Not at this time | |
| John C. Harpole | Not at this time | |
| Jerry Harpole III | Not at this time | |
| James T. Harpole | Not at this time | |

---

[1] Net Recovery shall mean: "All funds collected by the Debtor or Reorganized Debtor as the result of any cause of action under Sections 502, 510, 541, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code, or under related state or federal statues and common law, including fraudulent transfer laws, whether as the result of payment on or collection of a judgment, or settlement, net of reasonable attorneys' fees and costs incurred in collecting such funds."

9

| | | |
|---|---|---|
| Wesley Hunter | Not at this time | |
| Harpole Development, LLC | Yes- Debtor filed Motion to Approve Settlement (Docket No. 261). The objection deadline for this settlement motion is August 1, 2016. | Debtor filed a motion to approve a settlement that would transfer the TX Property out of Harpole Development and to the Debtor. The Debtor has included the appraised value of this property in its liquidation analysis attached as an exhibit to this Disclosure Statement. |
| | | |
| American Express | Not at this time | |
| Aztec Feed and Supply, Inc. | Not at this time | |
| Blue Cross Blue Shield | Not at this time | |
| Enduro Pipeline Services, Inc. | Not at this time | |
| Honnen Equipment Company | Not at this time | |
| Industrial Maintenance Contractors, Inc. | Yes- Order Entered | Settlement reduces Class 6 by Industrial Maintenance Contractors, Inc.'s claim of $111,849.00. Debtor received $47,735.31. |
| Internal Revenue Service | Not at this time | |
| Kirby Smith Machinery, Inc. | Not at this time | |
| Kysar Insurance Agency, Inc. | Not at this time | |
| Metro Equipment & Rental Co. | Not at this time | |
| Nationwide Trust | Not at this time | |
| Noel's, Inc. | Not at this time | |
| Pipetech | Not at this time | |
| Roper, Inc. | Yes- Order Entered | $55,000.00 and release of Roper's unsecured claim. |
| Serco Fencing Inc. | Not at this time | |
| Southwest AG, Inc. | Not at this time | |
| TechCorr USA Management, LLC | Not at this time | |
| Texas State Comptroller | Not at this time | |
| T.G. Mercer Consulting Services | Yes- Adversary Pending | $93,000.00 |
| Travelers Insurance Agency | Not at this time | |
| Turner Seed Co. | Not at this time | |
| WEX, Inc. | Yes-Order Entered | $100,000.00 received on 7/25/16 |
| Worldwide Machinery | Not at this time | |

| Pipeline Division | | |
| --- | --- | --- |
| X-trem Fence | Not at this time | |
| 4 Rivers Equipment, LLC | Not at this time | |

*1. Leases with Insiders:*

In the Plan, the Debtor proposes to assume two of the three leases on three properties that it operates out of. The Reorganized Debtor will own the property that is the subject of the lease it is not assuming (the TX Lease as defined below). These leases are necessary to run the Debtor's business. The first lease is between the Debtor and Harpole Development, Inc. for the rental of the Yard at 9701 WCR #154, Midland, TX ("TX Lease"). The second lease is between the Debtor and Jerry and Debbie Harpole for the rental of the Yard at 60 CR 3961, Farmington, NM ("Farmington Lease"). The third lease is between the Debtor and Jerry Harpole for the rental of the Yard at 129 S. Grimes, Hobbs, NM 88240 ("Hobbs Lease"). The lessees for all three leases are insiders of the Debtor.

All three leases began on January 1, 2014 and terminate on December 31, 2016. All three leases have automatic renewal provisions. The automatic renewal provision renews the lease for an additional period of one year per term, unless either party gives written notice of termination no later than sixty days prior to the end of the term or renewal term. Neither the Debtor nor either of the 3 landlords have given notice of termination of the leases. It is the Debtors intent to assume all three leases under the Plan.

The Debtor does not believe that any action for fraudulent transfer exists in connection with the three leases listed above. The Debtor has paid reasonably equivalent value in exchange for the leases as shown by market rental appraisals in the ordinary course of its business.

If the Debtor did not rent these three properties it would have to rent three other properties to properly operate in the locations it does business. Jobs are bid in each of the three locations and the employees and equipment required are dispatched out of the closest facility. As the market rental appraisals show, the Debtor would pay similar amounts with other lessees. Currently the Debtor is not utilizing the TX Lease, but anticipates its use with future projects post-confirmation.

The Debtor paid a total of $338,000.00 on the three leases from January 1, 2014 until the Petition Date of October 2, 2015.

Bankruptcy Code Section 548(a)(1)(B) allows the Debtor to avoid an interest of the debtor in property made within two years of the Petition Date, when the Debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation". The Bankruptcy Code does not define the phrase "reasonably equivalent value." However, to determine whether the Debtor has received reasonably equivalent value, courts "consider the totality of the circumstances surrounding the allegedly fraudulent transfer." *In re Xtra Petroleum Transp., Inc.*, No. 11-12639-J11, 2012 WL 1207406, at *6 (Bankr. D.N.M. Apr. 11, 2012). Reasonably equivalent value does not require a dollar-for-dollar equivalent exchange. *Id.* "The debtor need only have received a tangible value for itself, not the creditors," and the court will examine

11

"'what the debtor surrendered and what the debtor received . . .'" *In re Tarin*, 454 B.R. at 183 (citation omitted). "A court should 'evaluate the value given at the time payment is made.'" *In re Xtra Petroleum Transp., Inc.* at *6.

In regards to the three leases, the Debtor received reasonably equivalent value in exchange for the lease payments. The Debtor received a tangible benefit from the leases, it uses the properties subject to the leases to operate its business. The Debtor needs to use the property or property such as the leased property to conduct its business and obtain income.

The lease payments are equivalent to the value of the property. Based on the market appraisals, the market rate for the properties subject to the leases was higher than the lease rate under the leases.

The leases do not impose any onerous requirements on the Debtor. Although Debtor is required to maintain property and liability insurance, that is a customary requirement in commercial leases.

The Debtor does not believe that any action for fraudulent transfer under the Bankruptcy Code exists in regards to the lease payments between the Debtor and the above listed insiders.

The Debtor does not believe that any action for fraudulent transfer exists under New Mexico State law.  New Mexico Statues provide for voiding a transfer if the Debtor "…incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation…" N. M. S. A. 1978, § 56-10-19(A).  The state fraudulent transfer statute is similar to the Bankruptcy Statue in that it is not applicable if a reasonably equivalent value was received for the transfer.  The Debtor believes that it received a reasonably equivalent value for the rent payments made under the leases.

**Farmington Lease**

The Farmington Lease is for property located at 60 CR 3961, Farmington, NM 97401. This property is owned jointly by Jerry Harpole and Deborah Harpole.  The Warranty Deed for this property was recorded on November 30, 2006 in San Juan County, NM.

The Warranty Deed reflects the sale of the Farmington Property from A.E. Dustin, Allman Dustin, Marilvin Dustin, Robert Dustin, Klaire R. Dustin, Ricky Dustin, Melanie Dustin, Rockie Dustin, Carilee Dustin, Cnnie Warner, Michael Warner, Tammy Dustin Ash, and Randall Ash to Jerry and Deborah Harpole on November 20, 2006.  This property is not now and has never been owned by the Debtor.  The purchase price of the Farmington Property was $400,000.00.

The rent on the Farmington Lease is for $7,500 a month.    The Farmington Lease began on January 1, 2014 and automatically renews yearly.

A market rental appraisal was done on the Farmington Lease property in 2014.  The report estimated the annual market rent rate to be $95,500 or $7,958.33 per month.

12

Payments of $7,500 a month are fair market value for the Farmington Lease.

**Hobbs Lease**

The Hobbs Lease is for property located at 129 S.Grimes, Hobbs, NM 88240. This property is owned by Jerry Harpole. The Warranty Deed for this property was recorded in Lea County New Mexico on May 15, 2012.

The Warranty Deed reflects the sale of the Hobbs Property from Martin Garcia and Delfina Garcia to Jerry Harpole on February 3, 2009. This property is not now and has never been owned by the Debtor. The purchase price of the Hobbs Property was $300,000.00.

The rent on the Hobbs Lease is for $5,000 a month. The Hobbs Lease began on January 1, 2014 and automatically renews yearly.

A market rental appraisal was done on the Hobbs Lease property in 2014. The report estimated the annual market rent rate to be $67,800 or $5,650.00 per month.

Payments of $5,000 a month are fair market value for the Hobbs Lease.

**TX Lease**

The TX Lease is for property located at 9701 WCR #154 Midland, TX 79706. This property ("TX Property") is owned by Harpole Development, Inc. Harpole Development, Inc. is owned by Jerry and Debbie Harpole. The Warranty Deed for this property was recorded in Midland, TX on February 18, 2014.

The Warranty Deed reflects the sale of the TX Property from Charles R. Tarrant to Harpole Development, Inc. on February 13, 2014. This property is not now and has never been owned by the Debtor. The purchase price of the TX Property was $250,000.00.

The TX Property was purchased with funds from the Debtor. The Debtor, HDI, and Jerry and Deborah Harpole have reached a settlement to transfer the TX Property to the Debtor upon approval of the settlement motion.

The rent on the TX Lease is $5,000 a month. The TX Lease began on January 1, 2014 and automatically renews yearly.

An appraisal on the TX Property estimates the fair market value of the TX Property to be $275,000.00. (Exhibit Q).

The Debtor believes Payments of $5,000 a month were fair market value for the TX Lease.

The Reorganized Debtor will own the TX Property and will not be making lease payments.

13

## 2. Compensation paid to Insiders

Jerry E. Harpole, Sr. is Debtor's President and is a forty percent (40%) shareholder; Deborah Harpole is Debtor's Secretary/Treasurer and is a forty percent (40%) shareholder; Jerry E. Harpole, Jr. is a ten percent (10%) shareholder; John E. Harpole is a ten percent (10%) shareholder; Jennifer Harpole is Jerry E. Harpole, Jr.'s wife; John C. Harpole is a Jerry Harpole's brother; Jerry E. Harpole III is Jerry Harpole's grandson; James T. Harpole is Jerry Harpole's son; and Wesley Hunter is Jerry Harpole's brother (together the "Insiders").

Insiders were paid salary, distributions, cash, and car payments were made on behalf of the insider. Please see Exhibit K for a spreadsheet that breakdown the insiders transfers for the last year.

All funds paid were compensation for the Insiders and as such were not fraudulent conveyances. The funds paid were in exchange for work performed by the Insiders. At this time the Debtor does not believe any actions for fraudulent transfers exist for the compensation paid listed on the attached Exhibit K.

The Debtor does not believe that recovery from the individuals that are insiders is feasible. Jerry and Deborah Harpole owe considerable personal debt, including debts to the IRS. It is likely that any judgments obtained against them would be unenforceable. Jerry and Deborah Harpole have retained bankruptcy counsel. The Debtor believes that it would cost more in litigation and attorney fees than any possible recovery against the individual insiders.

## 3. Identification of Preferential Payments to Creditors

Debtor filed its voluntary petition (the "Petition") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on October 2, 2015 (the "Petition Date"). In the course of preparing its Petition, Harpole and its counsel examined its accounts payable to determine which creditors it had paid more than $6,225 in the 90 days prior to the Petition Date (the "Preference Period"), which was on or after July 4, 2015. Upon review of the accounts payable, Debtor identified the twenty-five (25) non-insider creditors that were paid more than $6,225 on or after July 4, 2015. *See* Doc. 18 at 76-79;

*a.* **American Express Corporation ("American Express"):**
Debtor made payments to American Express, in the amount of $46,219.42, during the Preference Period. Debtor's counsel, William F. Davis & Associates, P.C. reviewed all of Debtor's statements from American Express for the Preference Period, as well as Debtor's account payment history, which showed all of Debtor's payments to American Express, dating from October 2, 2014, to October 2, 2015. After its review, on May 2, 2016, Debtor sent American Express a letter demanding the return of Debtor's payments to American Express during the Preference Period, in the total amount of $46,219.42. On May 9, 2016, American Express' attorney, Crystal Jones Oswald, e-mailed Debtor's counsel stating that American Express had given Debtor new value totaling $54,001.06, and, therefore, American Express did not have any potential liability to Debtor pursuant to 11 U.S.C. § 547(c)(4). Upon further review of the American Express statements, Debtor determined that American Express did have a new

14

value defense that would completely eliminate Debtor's claim against American Express. Accordingly, Debtor does not intend on pursuing, or recovering, any preferential transfers from American Express.

b.     **Aztec Feed and Supply, Inc. ("Aztec"):**

Debtor made a payment to Aztec, in the amount of $6,929.93, during the Preference Period. Debtor's counsel, William F. Davis & Associates, P.C. reviewed all of Debtor's statements from Aztec for the Preference Period, as well as Debtor's account payment history, which showed all of Debtor's payments to Aztec, dating from October 2, 2014, to October 2, 2015. Debtor is currently determining whether it intends on pursuing claims against Aztec based on the preferential payments.

c.     **Blue Cross Blue Shield ("BCBS"):**

Debtor made payments to BCBS, in the amount of $98,492.99, during the Preference Period. Debtor does not intend on pursuing a preferential transfer claim against BCBS. BCBS provides Debtor's health insurance policies, and Debtor's payments to Blue Cross Blue Shield were made as current payments owed under the health insurance policies.

d.     **Enduro Pipeline Services, Inc. ("Enduro"):**

Debtor made payments to Enduro, in the amount of $52,300.00, during the Preference Period. Debtor does not intend on pursuing a preferential transfer claim against Enduro. Enduro provided equipment and/or services to Debtor for use in its work on property "owned, leased or otherwise occupied by or in the possession of Western Refining." *See* Doc. 122. As such, Enduro was entitled to file a lien under Texas' mineral lien act. *See* Tex. Prop. Code Ann. § 56.001 *et seq.* Accordingly, Enduro, along with various other potential lien claimants and with the Court's permission, was paid any remaining amounts it was owed by Debtor. *See* Doc. 122.

e.     **Honnen Equipment Company ("Honnen"):**

Debtor made a payment to Honnen, in the amount of $20,400, during the Preference Period. Debtor discovered that it does not have a preferential transfer claim against Honnen Equipment, however. The check Debtor issued to Honnen during the Preference Period was returned for nonsufficient funds and was never re-issued.

f.     **Industrial Maintenance Contractors, Inc. ("IMCON"):**

Debtor made payments to IMCON, in the amount of $95,470.62, during the Preference Period. Debtor's counsel, William F. Davis & Associates, P.C. reviewed all of Debtor's statements from IMCON for the Preference Period, as well as Debtor's account payment history, which showed all of Debtor's payments to IMCON, dating from October 2, 2014, to October 2, 2015. After its review, on May 2, 2016, Debtor sent IMCON a letter demanding the return of Debtor's payments to IMCON during the Preference Period, in the total amount of $95,470.62. On May 16, 2016, Debtor's attorney and counsel for IMCON, David Elder, began discussing the settlement of Debtor's claims. On May 18, 2016, Debtor and IMCON agreed to settle all of Debtor's claims against IMCON in exchange for IMCON waiving all of its claims against Debtor, including its unsecured claim in the amount of $111,849, as well as paying Debtor $47,735.31 immediately following the Court's approval of the settlement. Debtor filed a motion to approve the settlement on May 19, 2016. Doc. 221. An order approving the settlement was

15

entered on June 9, 2016. (Docket No. 239). The Debtor received a check for $47,735.31.

    *g.*     **Internal Revenue Service ("IRS"):**
Debtor made payments to the IRS, in the amount of $618,558.91, during the Preference Period. Debtor does not intend on pursuing a preferential transfer claim against the IRS. Debtor's payments to the IRS were made on account of priority taxes owed by the Debtor.

    *h.*     **Kirby Smith Machinery, Inc. ("KSM"):**
Debtor made payments to KSM, in the amount of $55,341.59, during the Preference Period. Debtor does not intend on pursuing a preferential transfer claim against KSM. Debtor believes that the pursuit of such a claim would damage Debtor's relationship with KSM and others, which would harm Debtor's business and ultimately cause Debtor to lose substantial income that would outweigh any potential benefits Debtor and the estate would receive from pursuing its claim against KSM.

    *i.*     **Kysar Insurance Agency, Inc. ("Kysar"):**
Debtor made payments to Kysar, in the amount of $109,246.00, during the Preference Period. Debtor's counsel, William F. Davis & Associates, P.C. reviewed all of Debtor's statements from Kysar for the Preference Period, as well as Debtor's account payment history, which showed all of Debtor's payments to Kysar, dating from October 2, 2014, to October 2, 2015. Debtor believes that Kysar may have a contemporaneous exchange and/or subsequent value defense to Debtor's preferential transfer claim pursuant to 11 U.S.C. § 547(c). Debtor is currently determining whether, and to what extent, it intends on pursuing claims against Kysar based on the preferential payments.

    *j.*     **Metro Equipment & Rental Co. ("Metro"):**
Debtor made a payment to Metro, in the amount of $7,862.32, during the Preference Period. Debtor is currently obtaining additional information to determine whether, and to what extent, it intends on pursuing claims against Metro based on preferential payments.

    *k.*     **Nationwide Trust ("Nationwide"):**
Debtor made payments to Nationwide, in the amount of $16,026.24, during the Preference Period. Debtor does not intend on pursuing any preferential transfer claims against Nationwide. Nationwide maintains Debtor's 401(k) plan with and is not a creditor of the Debtor.

    *l.*     **Noel's, Inc. ("Noel's"):**
Debtor made a payment to Noel's, in the amount of $12,344.82, during the Preference Period. Debtor's counsel, William F. Davis & Associates, P.C. reviewed all of Debtor's statements from Noel's for the Preference Period, as well as Debtor's account payment history, which showed all of Debtor's payments to Noel's, dating from October 2, 2014, to October 2, 2015. Debtor is currently determining whether, and to what extent, it intends on pursuing claims against Noel's based on the preferential payments.

    *m.*     **Pipetech:**
Debtor made a payment to Pipetech, in the amount of $38,070.00, during the Preference Period. Debtor does not intend on pursuing a preferential transfer claim against Pipetech.

Case 15-12630-t11    Doc 275    Filed 07/29/16    Entered 07/29/16 14:25:00 Page 16 of 39

Pipetech provided equipment and/or services to Debtor for use in its work on property "owned, leased or otherwise occupied by or in the possession of Western Refining." *See* Doc. 122. As such, Pipetech was entitled to file a lien under Texas' mineral lien act. *See* Tex. Prop. Code Ann. § 56.001 *et seq.* Accordingly, Pipetech, along with various other potential lien claimants and with the Court's permission, was paid any remaining amounts it was owed by Debtor. *See* Doc. 122.

   *n.*    **Roper, Inc. ("Roper"):**
      The Debtor and Roper have filed a Motion to approve Settlement (Docket No. 253). The Deadline to object to the settlement motion was July 25, 2016. No objections to the settlement were filed. The Settlement was approved by court order. The terms of the Settlement are as follows:
   1. Roper shall grant to the Debtor an enforceable judgment of $55,000.00 to be paid in 3 payments. The first payment of $18,333.34 is to be made on the date that is 30 days after the entry of an Order on this Settlement. The Second payment of $18,333.33 shall be due within 60 days of the Order entered on this Settlement. The third and final payment of $18,333.33 shall be due within 90 days of the Order entered on this Settlement. No interest shall accrue or be charged on the judgment of $55,000.00. The Debtor shall not seek to enforce this judgment as long as payments are made as set out in this paragraph. If the payments are not made as set forth in this paragraph the Debtor may seek enforcement of the judgment.
   2. The judgment outlined above shall be held by Debtor's attorney and will not be enforced unless there is a default.
   3. Upon the entry of an Order approving this Settlement, Roper shall no longer be an interested party in this Bankruptcy Case and will no longer have the authority to vote on any plan of reorganization or to participate any further in this Bankruptcy Case.
   4. Roper shall withdraw any pending objection to the Amended Plan and Disclosure Statement and shall not be permitted to file any objection to the Amended Plan and Disclosure Statement or any subsequent Plan or Disclosure Statement filed in this case.
   5. Roper shall not be permitted to vote on the Amended Plan or any subsequent filed Plan in this case.
   6. Roper's proof of claim and amended proof of claim are disallowed in their entirety. An order substantially similar to the one attached as Exhibit A to the Motion shall be entered upon an order approving this Settlement.
   7. Roper shall not have a claim of any kind in this case.
   8. Roper shall withdraw from the Committee of Unsecured Creditors and as an interested party in this case.
   9. Upon entry of an Order on this Settlement the Debtor shall withdraw its Emergency Motion.
   10. Upon entry of an Order on this Settlement the Debtor shall withdraw its Motion to Designate.
   11. Upon completion of the 3 payments totaling $55,000.00 by Roper, the Debtor shall file an order in Adversary Case 16-01036 dismissing the complaint with prejudice.

   *o.*    **Serco Fencing Inc. ("Serco"):**
      Debtor made a payment to Serco, in the amount of $12,459.29, during the Preference Period. Debtor does not intend on pursuing a preferential transfer claim against Serco. Debtor

believes that the pursuit of such a claim would damage Debtor's relationship with Serco and others, which would harm Debtor's business and ultimately cause Debtor to lose substantial income that would outweigh any potential benefits Debtor and the estate would receive from pursuing its claim against Serco.

*p.* **Southwest AG, Inc. ("Southwest"):**
Debtor made a payment to Southwest, in the amount of $27,500, during the Preference Period. Debtor does not intend on pursuing a claim against Southwest, however, because Debtor paid for the item it purchased from Southwest on the same day it ordered the item. Therefore, Southwest likely has a valid defense under 11 U.S.C. § 547(c)(1) and/or 11 U.S.C. § 547(c)(2).

*q.* **TechCorr USA Management, LLC ("TechCorr"):**
Debtor made payments to TechCorr, in the amount of $19,415.42, during the Preference Period. Debtor's counsel, William F. Davis & Associates, P.C. reviewed all of Debtor's statements from TechCorr for the Preference Period, as well as Debtor's account payment history, which showed all of Debtor's payments to TechCorr, dating from October 2, 2014, to October 2, 2015. After its review, on May 2, 2016, Debtor sent TechCorr a letter demanding the return of Debtor's payments to TechCorr in the total amount of $19,415.42. As of May 18, 2016, Debtor has not received a response from TechCorr. Debtor is currently determining whether, and to what extent, it will pursue its claim against TechCorr.

*r.* **Texas State Comptroller ("Comptroller"):**
Debtor made a payment to the Comptroller, in the amount of $75,275.86, during the Preference Period. Debtor does not intend on pursuing a preferential transfer claim against the Comptroller. Debtor's payments to the Comptroller were made on account of priority taxes owed by the Debtor.

*s.* **T.G. Mercer Consulting Services ("T.G. Mercer"):**
Debtor made a payment to T.G. Mercer, in the amount of $93,000, during the Preference Period. Debtor's counsel, William F. Davis & Associates, P.C. reviewed all of Debtor's statements from T.G. Mercer for the Preference Period, as well as Debtor's account payment history, which showed all of Debtor's payments to T.G. Mercer, dating from October 2, 2014, to October 2, 2015. After its review, on May 2, 2016, Debtor sent T.G. Mercer a letter demanding the return of Debtor's payments to T.G. Mercer during the Preference Period, in the total amount of $93,000. T.G. Mercer did not respond to Debtor's demand letter and, on June 3, 2016, Debtor filed a Complaint for Avoidance of Preferential Transfer against T.G. Mercer, seeking avoidance of the $93,000.00 payment.

*t.* **Travelers Insurance Agency, Inc. ("Travelers"):**
Debtor made payments to Travelers, in the amount of $118,725.27, during the Preference Period. Debtor's counsel, William F. Davis & Associates, P.C. reviewed all of Debtor's statements from Travelers for the Preference Period, as well as Debtor's account payment history, which showed all of Debtor's payments to Travelers, dating from October 2, 2014, to October 2, 2015. Debtor is currently obtaining additional information to determine whether, and to what extent, it intends on pursuing claims against Travelers based on the preferential payments.

*u.* **Turner Seed Co. ("Turner Seed"):**

Debtor made a payment to Turner Seed, in the amount of $11,756.16, during the Preference Period. Debtor does not intend on pursuing a claim against Turner Seed, however, because Debtor paid for the items it purchased from Turner Seed one day after it purchased the items. Therefore, Turner Seed likely has a valid defense under 11 U.S.C. § 547(c)(1) and/or 11 U.S.C. § 547(c)(2).

*v.* **WEX, Inc. ("WEX"):**

Debtor made payments to WEX, in the amount of $541,000.54, during the Preference Period. Debtor's counsel, William F. Davis & Associates, P.C. reviewed all of Debtor's statements from WEX for the Preference Period, as well as Debtor's account payment history, which showed all of Debtor's payments to WEX, dating from October 2, 2014, to October 2, 2015. The Debtor and WEX have reached a settlement and filed a Motion to Approve Compromise (Docket No. 240). An Order on The Motion to Approve Compromise was entered on July 11, 2016. (Docket No. 257). The terms of the settlement are as follows: (1) WEX will pay Debtor $100,000.00 promptly upon the Court's approval of the agreement; (2) Debtor and WEX agree to mutually release each other, WEX's parent corporation, WEX, Inc., and the Parties' agents, insiders, and counsel from all claims, except WEX's unsecured claim against Debtor, which will be paid through Debtor's amended plan of reorganization; (3) WEX's unsecured claim against Debtor will be liquidated in the amount of $209,466.92, which is the amount listed on Schedule F accompanying the Petition, plus WEX's $100,000.00 payment to Debtor as a return of the preferential transfers. The Debtor received a check from WEX for $100,000.00 on July 25, 2016.

*w.* **Worldwide Machinery Pipeline Division ("Worldwide Machinery"):**

Debtor made a payment to Worldwide Machinery, in the amount of $6,435.00, during the Preference Period. Debtor does not intend on pursuing a preferential transfer claim against Worldwide Machinery. Worldwide Machinery provided equipment and/or services to Debtor for use in its work on property "owned, leased or otherwise occupied by or in the possession of Western Refining." *See* Doc. 122. As such, Worldwide Machinery was entitled to file a lien under Texas' mineral lien act. *See* Tex. Prop. Code Ann. § 56.001 *et seq.* Accordingly, Worldwide Machinery, along with various other potential lien claimants and with the Court's permission, was paid any remaining amounts it was owed by Debtor. *See* Doc. 122.

*x.* **X-trem Fence:**

Debtor made payments to X-trem Fence, in the amount of $31,800.00, during the Preference Period. Debtor does not intend on pursuing a preferential transfer claim against X-trem Fence. X-trem Fence provided equipment and/or services to Debtor for use in its work on property "owned, leased or otherwise occupied by or in the possession of Western Refining." *See* Doc. 122. As such, X-trem Fence was entitled to file a lien under Texas' mineral lien act. *See* Tex. Prop. Code Ann. § 56.001 *et seq.* Accordingly, X-trem Fence, along with various other potential lien claimants and with the Court's permission, was paid any remaining amounts it was owed by Debtor. *See* Doc. 122.

*y.* **4 Rivers Equipment, LLC ("4 Rivers"):**

19

Debtor does not intend on pursuing a preferential transfer claim against 4 Rivers. 4 Rivers provided equipment and/or services to Debtor for use in its work on property "owned, leased or otherwise occupied by or in the possession of Western Refining." *See* Doc. 122. As such, Enduro was entitled to file a lien under Texas' mineral lien act. *See* Tex. Prop. Code Ann. § 56.001 *et seq.* Accordingly, 4 Rivers, along with various other potential lien claimants and with the Court's permission, was paid any remaining amounts it was owed by Debtor. *See* Doc. 122.

G.      **Claims Objections**

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims. Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld. The procedures for resolving disputed claims are set forth in Article V of the Plan.

H.      **Current and Historical Financial Conditions**

The identity and fair market value of the estate's assets are listed in Exhibit B. The valuations are the Debtor's estimates.

The Debtor's most recent Pre-Petition financial statements are set forth in Exhibit C.

A summary of the Debtor's periodic operating reports filed since the commencement of the Debtor's bankruptcy case, for the full months of post-petition operations, is set forth in Exhibit D.

III.    **SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS**

See Exhibit I for a list of scheduled claims and amounts filed in the proofs of claim.

A.  **What is the Purpose of the Plan of Reorganization?**

As required by the Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

B.  **Unclassified Claims**

Certain types of claims are automatically entitled to specific treatment under the Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. As such, the Plan Proponent has *not* placed the following claims in any class:

1. *Administrative Expenses*

Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case which are allowed under § 507(a)(2) of the Code. Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before

20

the date of the bankruptcy petition. The Code requires that all administrative expenses be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

The following chart lists the Debtor's estimated administrative expenses, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|------|----------------------|--------------------|
| Expenses Arising in the Ordinary Course of Business After Petition date | **$286,270,000.00** (estimated) | Paid in full on later of the Effective Date of the Plan, or the date the claim is allowed, or as otherwise agreed between Debtor and creditor. |
| The Value of Goods Received in the Ordinary Course of Business Within 20 Days Before the Petition Date | **$0.00** | None |
| Professional Fees, as approved by The Court<br><br>Debtor's Counsel ($150,000.00)<br>Unsecured Creditors' Committee Counsel ($30,000)<br>Malott ($30,000) | **$210,000.00** (estimated) | Paid in full on later of the Effective Date of the Plan, or the date the claim is allowed, or as otherwise agreed between Debtor and creditor.<br><br>Fees due to Debtor's Counsel will incur 1% interest on the unpaid balance on the later of the Effective Date or the date Debtor's Counsel's fee application is approved. |
| Clerk's Office Fees | **$0.00** | Paid in full on the effective date of the Plan |
| Office of the U.S. Trustee Fees | **$13,000.00** | Paid in full on the effective date of the Plan |
| **TOTAL** | **$509,270.00** | |

On May 10, 2016 the Debtor paid $10,118.05 to TRD for post-petition taxes. At this time the Debtor does not believe there is any administrative claim for post-petition taxes, however should there be they will be treated as listed above.

2. *Priority Tax Claims*

Priority tax claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code. Unless the holder of such a § 507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim, in regular installments paid over a period not exceeding 5 years from the order of relief.

The following chart lists the Debtor's estimated § 507(a)(8) priority tax claims and their proposed treatment under the Plan:

As of the filing date of this Disclosure Statement, the Debtors have not completed their 2015 taxes. If there are any claims against the Debtors for their 2015 taxes, they will be treated as priority tax claims.

21

| Description (name and type of tax) | Estimated Amount Owed | Date of Assessment | Treatment |
|---|---|---|---|
| New Mexico Department of Workforce Solutions | $47,370.43 | | Allowed Priority Claims shall be paid in full, from Plan Payments, within 60 months of the Petition Date, as required by Bankruptcy Code §1129(A)(9)(c)(ii). |
| NM Taxation and Revenue Department ("TRD") | $290,144.26 | | Allowed Priority Tax Claims shall be paid in full, from Plan Payments, within 60 months of the Petition Date, as required by Bankruptcy Code §1129(A)(9)(c)(ii). All payments to TRD are to be mailed to TRD's Bankruptcy Section, P.O. Box 8575, Albuquerque, NM 87198-8575, or delivered to its offices, 5th Floor, Central and San Mateo NE, Albuquerque, NM. Each check will contain on its face the bankruptcy case number, and the notation "Plan Payment." Debtor will pay the statutory rate of interest on the Priority Tax Claim. |
| Texas State Comptroller | $10,959.47 | | Allowed Priority Tax Claims shall be paid in full, from Plan Payments, within 60 months of the Petition Date, as required by Bankruptcy Code §1129(A)(9)(c)(ii). |
| Texas Workforce Commission | $41,064.01 | | Allowed Priority Tax Claims shall be paid in full, from Plan Payments, within 60 months of the Petition Date, as required by Bankruptcy Code §1129(A)(9)(c)(ii). |

### C. Classes of Claims and Equity Interests

DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

1. *Classes of Secured Claims*

Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code. If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim.

The following chart lists all classes containing Debtor's secured prepetition claims and their proposed treatment under the Plan:

| Class # | Description | Insider? (Yes or No) | Impairment | Treatment |
|---|---|---|---|---|
| Class 1 | Secured claim of Ally Financial<br><br>Collateral description =<br><br>Secured to 2014 GMC 1500 VIN ending in 0715<br><br>Secured to 2013 Chevy 2500 vin ending in 6827<br><br>Secured to 2012 GMC 2500 VIN ending in 5514<br><br>Secured to 2013 Chevy VIN ending in 0206<br><br>Secured to 2013 GMC 3500 VIN ending in 6003<br><br>Secured to 2012 Chevy Silverado VIN ending in 8567<br><br>Secured to 2013 Chevy Silverado VIN ending in 6052<br><br>Secured to 2008 Chevy Silverado VIN ending in 6303<br><br>Secured to 2012 GMC Sierra VIN ending in 7248<br><br>Secured to 2012 Chevy Silverado VIN ending in 2373 | No | Impaired | Debtor will reinstate the original loan documents to non-default and non-accelerated status. This treatment cures any possible default under the original loan documents.<br><br>Treatment of Lien                =Retain lien until paid in full<br><br>2014 GMC 1500 VIN ending in 0715<br>Monthly Payment of $699.86<br>Interest Rate of 4.94%<br><br>2013 Chevy 2500 vin ending in 6827<br>Monthly Payment of $670.10<br>Interest Rate of 4.94%<br><br>2012 GMC 2500 VIN ending in 5514<br>Monthly Payment of $824.91<br>Interest Rate of 5.44%<br><br>2013 Chevy VIN ending in 0206<br>Monthly Payment of $670.10<br>Interest Rate of 4.94%<br><br>2013 GMC 3500 VIN ending in 6003<br>Monthly Payment of $977.71 |

| Class # | Description | Insider? (Yes or No) | Impairment | Treatment |
|---|---|---|---|---|
| | Allowed Secured Amount = $176,812.00

Priority of lien = 1

Principal owed=$176,812.00

Total claim=$176,812.00 | | | Interest Rate of 5.44%

2012 Chevy Silverado VIN ending in 8567
Monthly Payment of $730.93
Interest Rate of 7.24%

2013 Chevy Silverado  VIN ending in 6052
Monthly Payment of $1,085.49
Interest Rate of 5.44%

2008 Chevy Silverado VIN ending in 6303
Monthly Payment of $751.27
Interest Rate of 11.15%

2012 GMC Sierra VIN ending in 7248
Monthly Payment of $864.82
Interest Rate of 6.85%

2012 Chevy Silverado VIN ending in 2373
Monthly Payment of $837.88
Interest Rate of 5.44% |
| Class 2 | Secured claim of
Ford Motor Credit

Collateral description =

Secured to 2015 F350 Vin 6834

secured to 2015 F350 Vin 6835

Allowed Secured Amount = $55,747.00

Priority of lien = 1

Principal owed= $55,747.00

Total claim= $55,747.00 | No | Impaired | Debtor will reinstate the original loan documents to non-default and non-accelerated status.  This treatment cures any possible default under the original loan documents.

Treatment of
Lien            =Retain lien until paid in full

2015 F350 VIN ending in 6834
Monthly Payment of $753.28
Interest Rate of  6.99%

2015 F350 VIN ending in 6835
Monthly Payment of $753.28
Interest Rate of  6.99% |

24

| Class # | Description | Insider? (Yes or No) | Impairment | Treatment |
|---|---|---|---|---|
| Class 3 | Secured claim of Four Corners Community Bank<br><br>Collateral description = *Inter alia,* Accounts Receivable and all proceeds thereof<br><br>Allowed Secured Amount = At least $311,539.72 as of April 12, 2016<br><br>Priority of lien = 1<br><br>Principal owed= At least $311,539.72 as of April 12, 2016<br><br>Total claim= At least $311,539.72 as of April 12, 2016 | No | Impaired | Monthly Pmt = $5,000.00<br>Pmts Begin = on Initial Distribution Date<br><br>Pmts End =when paid in full<br><br>Interest rate % = 5.75%<br><br>Treatment of Lien =Retain lien until paid in full.<br><br>Class 3 consists of the claim of Four Corners Community Bank, to the extent that it is secured by property of the Debtor, including the Debtor's Accounts Receivables and all proceeds thereof. The treatment of the allowed secured claim will be at non-default and non-accelerated status. This treatment cures any possible default under the original loan documents. Any portion of the claim determined to be unsecured will be paid as set forth in Class 6 below. |
| Class 4 | Secured claim of GE Capital Commercial, Inc./Siemens Financial Services, Inc.<br><br>Collateral description =<br><br>Secured to 2015 Intl. Durastar 4400<br><br>Allowed Secured Amount =$79,000.00<br><br>Priority of lien = 1<br><br>Principal owed=$79,000.00<br><br>Total claim=$79,000.00 | No | Impaired | Debtor will reinstate the original loan documents to non-default and non-accelerated status. This treatment cures any possible default under the original loan documents.<br><br>Treatment of Lien =Retain lien until paid in full<br><br>Monthly Payment of $ 2,458.00<br><br>Interest Rate will be the non-default contract rate. |

DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT

| Class # | Description | Insider? (Yes or No) | Impairment | Treatment |
|---|---|---|---|---|
| Class 5 | Secured claim of John Deere Financial<br><br>**Collateral description** =<br><br>Secured to JD310SK Loader/Backhoe<br><br>Secured to JD410J Loader/Backhoe<br><br>Secured to JD850J DZ Vin 0830; JD240 VIN 5352<br><br>Allowed Secured Amount =$180,900.00<br><br>Priority of lien = 1<br><br>Principal owed=$180,900.00<br><br>Total claim=$180,900.00 | No | Impaired | Debtor will reinstate the original loan documents to non-default and non-accelerated status. This treatment cures any possible default under the original loan documents. The terms of the Agreed Order for Adequate Protection filed on February 17, 2016 in this case are incorporated herein by reference.<br><br>Treatment of Lien =Retain lien until paid in full<br><br>JD310SK Loader/Backhoe Monthly Payment of $ 1,730.83 Interest Rate of 2.9%<br><br>JD410J Loader/Backhoe Monthly Payment of $1,368.24 Interest Rate of 7.15%<br><br>JD850J DZ Vin 0830; JD240 VIN 5352 Monthly Payment of $4,406.39 Interest Rate of 5.4% |

Class 1 consists of the allowed secured claim of Ally Financial pursuant to Retain Installment Sales Contracts secured to Debtor's 2014 GMC 1500 VIN ending in 0715 dated April 23, 2014; 2013 Chevy 2500 VIN ending in 6827 dated November 23, 2013; 2012 GMC 2500 VIN ending in 5514 dated December 18, 2012; 2013 Chevy VIN ending in 0206 dated November 23, 2013; 2013 GMC 3500 VIN ending in 6003 dated December 18, 2012; 2012 Chevy Silverado VIN ending in 8567 dated November 5, 2013; 2013 Chevy Silverado VIN ending in 6052 dated December 18, 2012; 2008 Chevy Silverado VIN ending in 6303 dated August 6, 2013; 2012 GMC Sierra VIN ending in 7248 dated August 6, 2013; and 2012 Chevy Silverado VIN ending in 2373 dated December 18, 2012.

Class 2 consists of the allowed secured claim of Ford Credit pursuant to Retail Installment Sales Contracts secured to Debtor's 2015 F350 VIN 6834 dated November 3, 2014 and 2015 F350 VIN 6835 dated November 3, 2014.

Class 3 consists of the claim of Four Corners Community Bank, to the extent to which it is secured by property of the Debtor, including the Debtor's accounts receivable and all proceeds thereof.

Class 4 consists of the secured claim of GE Capital Commercial, Inc./Siemens Financial Services, Inc. pursuant to equipment loans secured to Debtor's 2015 Intl. Durastar 4400.

Class 5 consists of the secured claim of John Deere Financial pursuant to Loan Contracts and Security Agreements secured to Debtor's JD310SK Loader/Backhoe dated October 7, 2014; JD410J Loader/Backhoe dated July 14, 2014; and a UCC financing Statement, file number 20130006280C filed on April 11, 2013 in New Mexico for JD850J DZ VIN 0830 and JD240 VIN 5352.

### 2. *Classes of Priority Unsecured Claims*

Certain priority claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Code are required to be placed in classes. The Code requires that each holder of such a claim receive cash on the effective date of the Plan equal to the allowed amount of such claim. However, a class of holders of such claims may vote to accept different treatment.

The following chart lists all classes containing claims under §§ 507(a)(1), (4), (5), (6), and (a)(7) of the Code and their proposed treatment under the Plan:

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| n/a | None | n/a | n/a |

### 3. *Classes of General Unsecured Claims*

General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code. The following chart identifies the Plan's proposed treatment of Classes 6 and 7, which contains general unsecured claims against the Debtor:

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| Class 6 | General Unsecured Class (Non-Insiders) | Impaired | Allowed Class 6 Claims will be paid, *pro rata*, from Plan Payments of $30,000.00, commencing after the Initial Distribution Date and continuing monthly up to and including the sixtieth month. Class 6 will not receive any interest on their allowed claim. No creditor shall receive more than 100% of its allowed Claim amount. In addition to Plan Payments, Class 6 will receive 50% of the Net Recovery from Chapter 5 recoveries received post Effective Date. |

27

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| **Class 7** | Unsecured Creditors (Insiders) | Impaired | Allowed Class 7 Claims shall be paid, *pro rata*, from Plan Payments only if all Allowed Administrative Claims, Allowed Priority Tax Claims, other priority claims, secured tax claims, and Allowed Class 6 Claims have been paid in full. If Class 6 creditors have received a 100% distribution, the Debtor may, in its sole discretion, either make payments to the Class 7 creditors or terminate payment of any or all further Plan Payments. Any such termination of payment shall not constitute a default under the Plan. |

Class 6 consists of the allowed non-priority unsecured claims (non-insider) allowed under § 502 of the Code. See Exhibit I.

Class 7 consists of the allowed non-priority unsecured claims of insiders. This class includes rent owed to insiders and affiliates by the Debtor.

The Amount of the Allowed Class 6 Claims. The Debtor scheduled various claims as contingent, unliquidated and/or disputed and reserves the right to object to filed proofs of claim.

The Debtor estimates the percentage distribution from the Debtor's Plan Payments to Class 6 creditors to be 51%. The exact distribution percentage cannot be stated with certainty at this time, for two reasons. First, Class 6 may increase for unsecured amounts from lease rejection which would decrease the percent distribution. Second, the total of Class 6 may decrease due to disallowance of claims disputed by the Debtor that are ultimately disallowed. The decrease in the size of Class 6 would result in an increase percentage distribution. The Debtor will also contribute 50% of the funds from any Chapter 5 Net Recovery post Effective Date to Class 6 in addition to the monthly Plan Payment.

    4. *Classes of Equity Interest Holders*

Equity interest holders are parties who hold an ownership interest (*i.e.*, equity interest) in the Debtor. In a corporation, entities holding preferred or common stock are equity interest holders.

The following chart sets forth the Plan's proposed treatment of the classes of equity interest holders:

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| **Class 8** | Equity interest Holders: | Unimpaired | The shareholders of the Debtor will retain their |

28

| | | | | interest. |
|---|---|---|---|---|
| | Jerry Harpole, Sr. (40%)<br>Deborah Harpole (40%)<br>Jerry Harpole, Jr. (10%)<br>John Harpole (10%) | | | |

In the event there is a rejecting impaired class, the Debtor will conduct an auction to sell its Class 8 equity interests. The auction will convey 100% of the Debtor interest. No bids for partial interests will be accepted, the equity interest sold will be the equity interest of the Reorganized Debtor as set forth in the confirmed Plan. This auction will be conducted in such a way as to be fair and equitable with respect to the rejecting impaired class. The auction procedures will be approved by the Court by a separate and subsequent order.

D. **Means of Implementing the Plan**

1. *Source of Payments*

Payments and distributions under the Plan will be funded by the following:

Revenues from operations of the Reorganized Debtor. Five year projections are attached to this Disclosure Statement. Cash on hand will also fund implementation. Please see Exhibit S for future contract revenue. See Exhibit F.

2. *Post-confirmation Management*

The Post-Confirmation Managers of the Debtor, and their compensation, shall be as follows:

| Name | Affiliations | Insider (yes or no)? | Position | Compensation (Yearly) |
|---|---|---|---|---|
| Jerry Harpole, Sr. | President and 40% shareholder | Yes | President | $174,000.00 |
| Deborah Harpole | Secretary and Treasurer 40% shareholder | Yes | Secretary and Treasurer | $74,978.00 |
| Jerry Harpole, Jr. | 10% shareholder | Yes | Employee | $135,000.00 |
| John Harpole | 10% shareholder | Yes | Employee | $135,000.00 |

3. *UCC Authority*

The UCC shall have authority to bring Chapter 5 actions against insiders up to the Effective Date of the Plan. If no pending actions being brought by UCC prior to the Effective Date the UCC will be terminated on the Effective Date. If there are pending claims brought by the UCC against insiders on the Effective Date, the UCC will stay in place until all claims are resolved. Upon resolution of all claims the UCC is terminated. Employment of UCC Counsel will be terminated upon termination of the UCC.

29

E.     **Risk Factors**

The proposed Plan has the following risks:

The proposed Plan has the following risks, which are inherent in the consummation of any chapter 11 Plan: Claims may be allowed in amounts significantly different than projected by the Debtor, and economic conditions may decline further to such an extent that the Debtor cannot generate the projected cash flow. In the Oil and Gas industry oil prices and production may vary month to month. Weather and well conditions can cause month to month income variations for the Debtor.

The Debtor recommends that creditors accept the Plan.

F. **Executory Contracts and Unexpired Leases**

The Plan, in Section 6.01, lists all executory contracts and unexpired leases that the Debtor will assume under the Plan.

The Debtor will assume:

1.  Its Lease with Jerry and Debbie Harpole for the rental of the Yard at 60 CR 3961, Farmington, NM (Exhibit L); and
2.  Its Lease with Jerry Harpole for the rental of the Yard at 129 S. Grimes, Hobbs, NM 88240. (Exhibit M)

Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any. Plan Section 6.01 also lists how the Debtor will cure and compensate the other party to such contract or lease for any such defaults.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

All executory contracts and unexpired leases that are not listed in Section 6.01 will be rejected under the Plan. Consult your adviser or attorney for more specific information about particular contracts or leases.

Claims for rejected leases may increase the size of the general unsecured class.

If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

***The Deadline for Filing a Proof of Claim Based on a Claim Arising from the Rejection of a Lease or Contract is thirty (30) calendar days after the date of mailing to the claimant of notice of entry of the order confirming the Plan.*** Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

G. **Tax Consequences of Plan**

**Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors.**

The following are the anticipated tax consequences of the Plan:

Tax consequences to the Debtor of the Plan. The Debtor may obtain advice from qualified tax professionals concerning the tax aspects of the Plan, including tax consequences of any general forgiveness of debt, the proper utilization of any loss carry-forward and the basis of the assets of the Debtor. The Debtor does not expect any adverse tax consequences from confirmation of the Plan.

General tax consequences to creditors of any discharge/The general tax consequences of receipt of plan consideration after confirmation. The tax consequences to creditors, as a result of plan treatment and payments, will depend upon the circumstances of the individual creditor. The Debtor has not obtained rulings from the IRS with respect to any of these matters. Creditors should seek advice from their own tax professionals regarding the effect of the Confirmed Plan on their tax matters.

## IV. CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code. These include the requirements that: the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible. These requirements are not the only requirements listed in § 1129, and they are not the only requirements for confirmation.

A. **Who May Vote or Object**

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

**No holder of a claim or interest under Bankruptcy Code Section 11 U.S.C. 502 will be allowed to vote its full alleged claim amount if there is a pending objection to their claim or interest. If a vote is received by a creditor that is the subject of a pending claim objection, the Debtor will temporarily allow such claim under Bankruptcy Rule 3018(a) and under 11 U.S.C. 1126(e) with a value of $1.00 for voting purposes until such claim is resolved. At this time the Debtor believes this treatment applies to Industrial Maintenance Contractors, Inc.; Roper, Inc.; T.G. Mercer Consulting Services; and WEX, Inc. The ballot of these four creditors shall be valued at $1.00 for voting purposes unless the Debtor's objections to their claims are resolved prior to the voting deadline.**

31

In this case, the Plan Proponent, the Debtor, believes that classes 1, 2, 3, 4, 5, 6, and 7 are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan.

The Plan Proponent believes that class 8 is unimpaired and that holders of claims in this class, therefore, do not have the right to vote to accept or reject the Plan.

If a creditor in a class that is entitled to vote does not vote, they will be deemed to have accepted the Plan. Please see *Ruti-Sweetwater, Inc.* 836 F.2d 1263 (10th Cir. 1988).

1. *What Is an Allowed Claim or an Allowed Equity Interest?*

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest. When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

**The deadline for filing a proof of claim in this case was February 1, 2016.**

2. *What Is an Impaired Claim or Impaired Equity Interest?*

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is *impaired* under the Plan. As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

3. *Who is **Not** Entitled to Vote*

The holders of the following five types of claims and equity interests are *not* entitled to vote:

- holders of claims and equity interests that have been disallowed by an order of the Court;

- holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes.

- holders of claims or equity interests in unimpaired classes;

- holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code; and

- holders of claims or equity interests in classes that do not receive or retain any value under the Plan;

- holders of administrative expense claims;

- holders of claims pursuant to 11 U.S.C. §502(d).

- holders of claims designated under 11 U.S.C. §1126(e).

***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan [and to the Adequacy of the Disclosure Statement].***

### 4. *Who Can Vote in More Than One Class*

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

## B. **Votes Necessary to Confirm the Plan**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by cramdown on non-accepting classes, as discussed later in Section B.2.

If a creditor in a class that is entitled to vote does not vote, they will be deemed to have accepted the Plan.

### 1. *Votes Necessary for a Class to Accept the Plan*

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

### 2. *Treatment of Nonaccepting Classes*

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by § 1129(b) of the Code. A plan that binds nonaccepting classes is commonly referred to as a "cram down" plan. The Code allows the Plan to bind nonaccepting classes of claims or equity interests if the Plan meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not "discriminate unfairly", and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

***You should consult your own attorney if a "cramdown" confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.***

C.      **Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. A liquidation analysis is attached to this Disclosure Statement as Exhibit E.

Exhibit E is a liquidation analysis as of July 22, 2016, the date the Second Amended Disclosure Statement was filed.  The estimated value for vehicles listed on line d of Exhibit E was an estimate as of July 22, 2016 and excludes the estimated value for all vehicles surrendered by that date. This is why the vehicle value listed on Exhibit E is different than that listed on Exhibit B, which is the listing of assets on the Petition Date.

The liquidation analysis attached as Exhibit E is an estimate and may not be correct in today's market, recovery could be less.  Exhibit E is the Debtor's best estimate at this time.  The liquidation analysis does not indicate the devastation that may result in the community as a whole if the Debtor is liquidated.  All employees at the Debtor's 3 locations, at times over 100 individuals, would be out of work.  This large amount of unemployed individuals would have larger reaching effects on the economy of the communities they are located in.

D.      **Feasibility**

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan. The Debtor believes the Plan is feasible based on projected income from the Debtor's operations.

1.      *Ability to Initially Fund Plan*

The Plan Proponent believes that the Debtor will have enough cash on hand on the effective date of the Plan to pay all the claims and expenses that are entitled to be paid on that date. Tables showing the amount of cash on hand on the effective date of the Plan, and the sources of that cash are attached to this disclosure statement as Exhibit F.

2.      *Ability to Make Future Plan Payments And Operate Without Further Reorganization*

The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments.

The Plan Proponent has provided projected financial information. Those projections are listed in Exhibit G.

The Plan Proponent's financial projections show that the Debtor will have an aggregate annual average cash flow, after paying operating expenses and post-confirmation taxes. The final Plan payment is expected to be paid sixty (60) months after the Initial Distribution Date, which occurs sixty days after the Plan Effective Date, as defined in ¶8.02 of the Plan.

34

The Debtor believes that with the surrender of unused and duplicative equipment and the increased revenues projected from new projects that it will be able to meet the projections stated in Exhibit G.

***You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.***

## V.  EFFECT OF CONFIRMATION OF PLAN

A. <u>Discharge</u>. On the Confirmation Date of the Plan, subject to occurrence of the Effective Date, the Debtor will be discharged from all debts that arose before the Confirmation Date, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor will not be discharged of any debt (i) imposed by this Plan, (ii) of a kind specified in § 1141(d)(6)(A) if a timely complaint was filed in accordance with Rule 4007(c) of the Federal Rules of Bankruptcy Procedure, or (iii) of a kind specified in § 1141(d)(6)(B). After the effective date of the Plan your claims against the Debtor will be limited to the debts described in clauses (i) through (iii) of the preceding sentence.

B. <u>Injunction</u>.  Except as otherwise expressly provided in the Plan, entry of the Confirmation Order will permanently enjoin all Persons who have held, hold, or may hold Claims or Interests on and after the Effective Date (a) from commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Interest against the Debtor or Reorganized Debtor; (b) from the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtor or Reorganized Debtor or the property of the Debtor, the Estate, or the Reorganized Debtor with respect to any such Claim; (c) from creating, perfecting, or enforcing any encumbrance of any kind against the Debtor or the Reorganized Debtor or against the property of the Debtor, the Estate, or the Reorganized Debtor with respect of any such Claim; (d) from asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due from the Debtor or the Reorganized Debtor, or against the property of the Debtor, the Estate, or the Reorganized Debtor with respect to any such Claim.

C. <u>Full and Final Satisfaction of Debts</u>.  All Debts that arose before the Confirmation Date and any Debt of a kind specified in Section 502(g), 502(h) or 502(i) of the Code, whether or not a proof of claim based on such Debt is filed or deemed filed under Section 501, whether or not such Claim is allowed under Section 502, and whether or not the holder of such Claim has accepted this Plan, are fully and finally satisfied by this Plan.

D. <u>Modification of Plan</u>. The Debtor may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or re-voting on the Plan. The Debtor may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Court authorizes the proposed modifications after notice and a hearing.

E. <u>Final Decree</u>.  Once the estate has been administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Debtor, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case. Alternatively, the Court may enter such a final decree on its own motion.

35

F. <u>EFFECT ON LIENS AND THIRD PARTY RELEASES</u>.  **EXCEPT AS PROVIDED BY THE PLAN, ALL OTHER LIENS, CLAIMS OR INTERESTS IN THE DEBTOR'S PROPERTY SHALL BE NULL AND VOID AND OF NO FURTHER FORCE OR EFFECT.  THE COMPLETION OF PAYMENTS UNDER THE PLAN SHALL BE IN ACCORD AND SATISFACTION OF ANY AND ALL CLAIMS TREATED UNDER THE PLAN.  ONCE THE PLAN PAYMENTS ARE COMPLETED, CLAIMS ASSERTED AGAINST THE DEBTOR SHALL BE DEEMED PAID IN FULL, INCLUDING THE RELEASE OF RIGHTS TO ENFORCE OR COLLECT SUCH CLAIMS AGAINST NON-DEBTOR PARTIES.  ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR ARE RESTRAINED AND ENJOINED FROM (A) COMMENCING OR CONTINUING IN ANY MANNER, ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY SUCH CLAIM AGAINST THE DEBTOR, ITS AGENTS OR ATTORNEYS, ITS ASSETS OR THIRD PARTIES ALSO LIABLE FOR THE PAYMENT OF SUCH CLAIM (B) FROM ATTEMPTING TO INTERFERE WITH, DIVERT OR OTHERWISE EXERT ANY CONTROL OVER ASSETS OF THE DEBTOR  (C) ASSERTING ANY RIGHT OF SET-OFF, RIGHT OF SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE TO THE DEBTOR; AND (D) PERFORMING ANY ACT, IN ANY MANNER, IN ANY PLACE, THAT DOES NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THE PLAN; PROVIDED, HOWEVER, THAT ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHALL BE ENTITLED TO ENFORCE THEIR RIGHTS UNDER THE PLAN AND ANY AGREEMENTS EXECUTED OR DELIVERED PURSUANT TO OR IN CONNECTION WITH THE PLAN.**

G. <u>Liability of Debtor, Plan Fund Trustee, Officers, and Others</u>.  None of the Debtor, the Debtor-in-possession or any of its employees, officers, directors, agents or representatives, nor any professionals employed by them or any of their members, agents, representatives or professional advisors, shall have or incur any liability to any person or entity for any act taken or omission made in good faith in connection with or related to formulating, implementing, confirming or consummating the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with the Plan, provided however, that the foregoing does not, is not intended to, nor shall be construed as releasing any or all of the foregoing parties from liability from any act taken or omission made due to fraud, willful misconduct, or bad faith.

VI.     **OTHER PLAN PROVISIONS**

This Disclosure Statement does not set out all provisions that are contained in the Plan. Creditors should read the Plan in its entirety.  Other provisions included in the Plan include, but are not limited to, the following:

A.     <u>Property Vests in Reorganized Debtor</u>.  Upon the Effective Date, except as otherwise specifically set forth in this Plan all Property of the Estate of the Debtor and each and every claim or cause of action that was asserted or could have been asserted by the Debtor against any party, in the Bankruptcy Case or otherwise, including causes of action for recovery of preferences, fraudulent conveyances, and any other action maintainable under §§ 542 through 553 of the Bankruptcy Code, shall vest in the Reorganized Debtor, free and clear of all Claims and Interests except as specifically

36

provided for in the Plan or the Confirmation Order. Upon the Effective Date the Reorganized Debtor shall be substituted as a party to all pending matters, adversary proceedings, claims, administrative proceedings, and lawsuits involving the Debtor, whether before the Bankruptcy Court or otherwise. The Debtor is currently in discussions with Roper, Inc. and IMCON regarding potential causes of action.

B.      <u>Property Free and Clear of Liens</u>. All Property of the Estate and the Reorganized Debtor, whether real property, personal property, intangible property, or any other property interest of any nature whatsoever, shall be free and clear of all Claims and interests of creditors, Interest holders, and other parties in interest, except as specifically provided for in the Plan or the Confirmation Order.

C.      <u>Post-Confirmation Operations</u>. On the Effective Date, the Reorganized Debtor shall have full authority to operate its business, retain professionals, buy and sell its property, hire and fire employees, and otherwise operate to the fullest extent allowed by law, without further order of the Bankruptcy Court, and without Bankruptcy Court approval being required for compensation for any services rendered after the Confirmation Date.

D.      <u>Transferred/Retained Bankruptcy and Other Powers of the Reorganized Debtor</u>. The Reorganized Debtor shall, after the Effective Date, be assigned and retain the powers of a debtor- in-possession for the purposes of objecting to Claims and prosecuting claims and causes of action under §§ 542, 543, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code available to the Debtor's Estate, with full authority to preserve, compromise, and resolve all such Claims and cases of action. The Reorganized Debtor shall also have full right, power, and authority to investigate and, if necessary, object to Claims and to commence actions to collect any assets or causes of action.

E.      <u>Reservation of Rights</u>. All claims or causes of action, cross-claims, and counterclaims of the Debtor of any kind or nature whatsoever arising before the Confirmation Date and that have not been disposed of prior to the Confirmation Date shall be preserved for the benefit of the Reorganized Debtor, and vested in and prosecuted by the Reorganized Debtor as it sees fit. The chart below lists the specific claims the Debtor has at this time.

| Name | Chapter 5 Action Exist | Possible Recovery Amount |
| --- | --- | --- |
| Roper, Inc. | Yes- Order Entered | $55,000.00 |
| T.G. Mercer Consulting Services | Yes- Adversary Pending | $93,000.00 |

F.      <u>Litigation of Estate Claims</u>. Pursuant to 11 U.S.C. § 1123(b)(3)(B), the Reorganized Debtor shall retain and enforce, litigate, and liquidate all claims, causes of action, and interests belonging to the Debtor or the Debtor's Estate. The Reorganized Debtor shall have the choice whether to initiate, pursue, or, to conclude such litigation in its sole discretion. The UCC has authority to bring causes of action as stated in Section II.F and III.D.3 until the Effective Date. If the UCC brings such an action they can continue to prosecute such action post Effective Date until such claim is resolved.

G.      <u>Retiree Benefits.</u> Pursuant to 11 U.S.C. § 1129(a)(13), the Reorganized Debtor will continue all retiree benefits after the Effective Date to the same extent as were provided prior to

37

the Bankruptcy Filing. Except with regard to insiders, the insiders will not take retirement contributions from the Debtor until the case is closed. Insiders did not take retirement contributions from the Debtor during the pending of this Bankruptcy Case and will not take company distributions until the case is closed. Insiders may still make retirement distributions from their salaries.

Respectfully submitted,

Harpole Construction, Inc.

By: _Jerry Harpole Jr._
Jerry Harpole Sr., President

WILLIAM F. DAVIS & ASSOC., P.C.

By: _William F. Davis_
William F. Davis, Esq.
6709 Academy NE, Suite A
Albuquerque NM 87109
Telephone: (505) 243-6129
Fax: (505) 247-3185
Attorneys for Debtor/Plan Proponent

DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT